Good afternoon. May it please the Court, first I'd like to thank the Court for allowing the parties to appear before you today and to argue about some of these very important issues that affect trademark law, particularly in connection with the rules relating to abandonment of a mark. The central issue to be decided today in this appeal is whether there is a bright line test for what constitutes a bona fide use of a trademark. And if so, may a district court weigh the evidence in a summary proceeding to decide whether certain conduct does or does not amount to a bona fide use of a mark. And that, of course, would involve deciding whether a mark is being used for warehousing, some other bad faith purpose, or simply in the ordinary course of a business, highly factual issues to be determined on a summary proceeding. In this case, the district court decided as a matter of law that Ron Mallett's continuous but reduced sales after he survived a year of cancer treatment, as well as his transportation and interstate commerce of his backpacks and wallets to two trade shows each year in Florida, was a sufficient use of the mark of his mark to be bona fide. The district court discounted evidence of Mr. Mallett's continued sales, although not robust, because she found that after his four surgeries for cancer in 1998, there was no business left, and therefore, everything thereafter was not considered a bona fide use. With all due respect to Judge Minnella, who happens to be an extremely diligent and gifted judge, district courts may not make negative inferences on the record of facts to determine whether a use is an appropriate use under the Lanham Act. It's kind of like in a rule of reason case, in an antitrust case, where there are a host of facts determining whether something is anti-competitive or not. It is very atypical for a district court on summary judgment to engage in that analysis. There are very similar types of issues in a Lanham Act case, where you're looking at things like, what is the ordinary course of this particular business? What is appropriate use? What is the size of the business? Is this an appropriate use for this type of business? Here, we have a very small businessman operating out of his home. His warehouse was in his garage. Both before and after his bout with cancer, he was a sales rep for more than one line, including his own line of goods. It is true that before his bout with cancer, his sales were more robust, but he continued to sell his products with the trademark on the goods. He continued to believe that his backpacks were the best in the business. He continued to sell his goods to the same types of vendors. He continued to transport his goods in interstate commerce. And the question is, absent a bad faith motive for doing that, is that a bona fide use? And even if it were not, do we want a court in a summary proceeding to decide all those facts relating to that issue? When the Lanham Act was amended in 1988, one of the principal objectives of the legislature was to address the issue of warehousing of marks. And the reason for the language, and I'm quoting from Section 1127, a mark shall be deemed abandoned when its use has been discontinued with the intent not to resume such use. Use of a mark means the bona fide use of such a mark made in the ordinary course of trade and not made merely to reserve a right in a mark. Bona fide, according to Black's dictionary, as well as the Delrain court and other courts, means made in good faith, without fraud or deceit, sincere, genuine. Is there a question, essentially, as to whether he was using the mark? In other words, he had these products. He wanted to get rid of them. They had the mark on them. But was he in any sense using the mark, or was he just getting rid of it? It would have made no difference if it had a mark or didn't have a mark. He was just getting rid of some, for almost no money at all, some products that were left over, and they had the mark on them because they did originally, but he wasn't really exploiting the mark at that point. The facts are that the initial order that Mr. Mallett received was larger than his anticipated demand for the product. It was manufactured by a party where they were going to share the profits, and they brought in enough bags to last them for quite some time. Obviously, Mr. Mallett's cancer inhibited sales. But the bottom line is that the goods were brought in with the mark on it, per Mr. Mallett's specifications, and he was continuing to sell those goods for a profit. Now, remember that Mr. Mallett didn't have any cost in the goods. The manufacturer had cost in the goods, but the record indicates that at some point in the relationship, Mr. Mallett turned over about $16,000 worth of goods to the manufacturer, and basically everything else he had left was his goods to do what he deemed appropriate, and he had no cost in them. So everything that he sold was pure profit. So it wasn't ---- Let me ask you about that. Let me ask you about that issue. Your contention is that he was not selling below cost because of this somewhat unusual arrangement. The district court took the position that he was selling below cost. My question is, why does it matter? It doesn't matter. I think as a legal issue, it doesn't matter. I think the district court used that issue of selling below cost as a factor in her consideration as to whether Mr. Mallett had a business or was selling for a profit. Now, if you're selling, I mean, in any business, if you're selling to recover your money, there is a legitimate business reason behind that. Whether, I mean, it is typical in the apparel industry and lots of other industries at the end of a season to reduce your inventory by selling the goods below cost. If you have to, you replenish your funds and you prepare for a new season. So selling goods below cost should not be indicative of abandonment of a mark. As a matter of law, that would be an irrelevant consideration. I would agree. I would agree that of all the factual disputes in the record, it shouldn't make a difference whether the goods are sold below cost or not, because if we start setting up a test for abandonment as to whether a party sold goods below cost, there are lots of different inferences that can be drawn from selling goods below cost. And it's not the kind of inference that you want a court making in a summary determination. I mean, there might be good reasons for selling goods below cost that have nothing to do with abandonment of a mark. Well, let's assume it's a pure liquidation. Do you think that you still survive summary judgment if everyone concedes that he was just liquidating his business? Well, there were two different questions. Let's assume it was a pure liquidation as opposed to liquidating his business. He had a trademark for the sale of backpacks and wallets. Even assuming that he had sold all of his goods, that he had an inventory, would not necessarily mean that he abandoned his mark. For example, the very next day after he sold his goods, he could have received an order for more backpacks and wallets or a different style of backpacks and wallets under the same mark, and he could have continued his use of the mark. So merely selling off the inventory is not indicative of abandonment, for example. But if he didn't sell the goodwill along with the mark, then don't you have a problem? It's a slightly different problem, but if you're in a pure liquidation situation and all you have left is the mark and you have no operating business, do you think that your arguments are viable? Well, let's look at what was the operating business both before and after Mr. Mallet suffered from cancer. I mean, he always operated his business from his house. His inventory was in his garage. He sold the goods himself. At some point in the beginning, he did have some sales reps that additionally sold the goods, but there's no evidence in the record as to whether they did a good job or a bad job. Not much changed after his cancer other than the volume of goods that he sold. He continued to do that. But isn't the understanding in the record, as I understand it, that he was, in fact, liquidating both his inventory and the business? It wasn't a process of doing that, but he hadn't done it yet. And, in fact, he did eventually do that. So I'm not sure. I'm sorry, but the record does not support that he was liquidating his business. The record only supports that he was selling off his inventory of the backpacks and continuing to do so. The question that he was asked was, was he continuing to sell his inventory or – and the word was put in his mouth, were you liquidating your inventory? And, of course, the answer is, yes, I was liquidating my inventory. That's what I was doing. I was selling off the remaining inventory that I had. Let's suppose the record was – there had been a clearer question asked than answered, which is, did you – and did you intend to buy anything else and sell anything else under the Pelican Mark? And he said no. Would that make a difference? I don't think it would make a difference on this record, and here's why. Every time Mr. Mallett took his backpacks and wallets to, let's say, the Florida trade show, at any time, somebody – and this happens, by the way, in these trade shows. Some company could have seen his product and said, I like these backpacks and wallets. Let me order some. And at that point, when he's got an order, he will order some more backpacks and wallets. You know, if you go to these surfwear trade shows, there are all kinds of small vendors. This is the nature of this industry. And they sell watches, backpacks, wallets, all kinds of other surf-related items in small quantities. And sometimes they hit – you know, they can go for years selling small quantities until some company says, I like this label and I like this concept. I'm going to order 20,000 of them. Can you get me some? So your argument is not – or you're not willing to rest simply on the argument that he was selling goods with the mark, the mark had goodwill behind it, and it was – and to that degree, he was exploiting the mark. And it doesn't matter what was going to happen afterwards. Even if we know he's never going to sell – to buy any more inventory, that doesn't make a – wouldn't make a difference. That's correct. It's not your position. A small vendor – That's not your position, as I understand it. Your position seems to be that we – that it has to be at least possible that he might stay in business. That simply the liquidating of a – the sale of goods and the liquidation of a business, if that's what we know is happening, is outside – is an abandonment, even while the sales are still going on. Is that your understanding? That's correct. If we were to have a standard that, in connection with discontinuing a product line or any other sell-off of inventory, that that is indicative of abandonment, we're going to have a big problem, because businesses do this as a regular basis without any intention of abandoning their mark. The question is, in what context does that happen? I understand it. But suppose – suppose this is what happens. Suppose he said, this is January 1, 2001. As of January 1, 2002, I'm going – I'm going to be out of business. But between January 1, 2001 and January 1, 2002, I'm going to continue to sell my inventory with my mark. Would that be an abandonment for the period between January 1, 2001, January 1, 2002? No. Even though we know he's going to – no. No. So what – so the abandonment of the business isn't relevant to either. It is not. Imagine a situation in which a company announces that it is intending to discontinue a division, but it sells branded items, and there are lots of branded items in inventory, and they're going to engage in a sale over the next two years. And imagine the chaos that is going to be – come into the marketplace if other vendors start selling goods with the same trademark and contend that it's perfectly okay to confuse consumers during that two-year period because this company has announced that it's going to discontinue this line of goods or this division, and therefore consumers are no longer associating the product with the original manufacturer. It would cause chaos. So we can have a situation in which companies start selling off inventory, and during that inventory sell-off, it is deemed that that is an act of abandonment and allow other vendors to start using the mark. I mean, it – the words of the legislature in 1127 is there has to be a complete cessation – well, not complete, a cessation of use for three years. I mean, excuse me. It's not three. It's a complete cessation of use, and then there's a prima facie case after three years. And there's a reason for that. You've got to have non-use for a significant period of time before you get to the issue of abandonment. And in the cases, in most of the cases that found abandonment, there was something more when there was a liquidation of inventory issue at stake. And the something more was bad faith. For example, in the Yoplait case, that is the Sodema case, Yoplait basically parked the Yopream label for several years by originally applying for the mark and selling $2.52 worth of the goods. Court deemed that not to be a bona fide use. In the Polonus case, a company acquired the trademark, sold heaters into the marketplace, and went out of its way in an advertising campaign to destroy the goodwill of that mark because it introduced two new brands of heaters, and it wanted to destroy that mark, even though it had inventory on sale. And the court ---- But in this case, not to interrupt you, but getting back to your earlier remarks, though, you seem to indicate that you, your client, could sell all the inventory and just hold the mark, in your judgment, with the hope that someone would order more product that would be manufactured. Why isn't that under that scenario? And I'm not saying that this is the fact of the case, but why doesn't that constitute warehousing, that kind of activity? Because the nature of warehousing, based upon the cases that I've read, indicates that the party that is engaging in that act has never really used that mark, had no intention of ever using that mark, and is just trying to keep competitors at bay and is using another mark for the same business. And that was the situation in the Yale Play case, and that is the situation in many of the warehousing cases, in which a company is attempting to keep others at bay from using a mark that it has no intention of using, and that's what is considered warehousing. But here you have a small business person that has been using the mark from the beginning of time, in the same way, selling it to the same vendors with the goods that are marked. And there's nothing in this record that indicates, there's no clear statement in this record that indicates that he ever intended to close his business down completely. The only evidence in the record is that he didn't reorder goods because he didn't have, he had more than enough inventory to last at this point, and there was no reason for it. I have, I guess, two questions. Once again, you're saying, you're stressing the fact that there was no evidence that he intended to close his business down completely. And I'm still having trouble understanding what the relevance of that fact is. For one thing, if you go to trial in this case and it turns out that he did intend to close his business down completely, you're going to be in trouble if you continue to take the view that that matters. And I'm having a hard time understanding why it matters. The only reason it matters in this appeal, Your Honor, I wouldn't have made this argument, but the way that the district court got around the absence of a cessation of use of the mark and the continued transportation of the goods at Interstate Commerce is to decide as a matter of law that after 1998, all use of the mark was not bona fide. And that is, and it wasn't bona fide because Mr. Mallett ostensibly closed his business in 1998. And I would agree. That is not a proper analysis. It is not a proper issue. It's not a proper determination. And the only reason I'm addressing it is because we don't think on this record that this district court can ignore the evidence of continued sales and good faith activity by just claiming that or deciding as a matter of law that the business was closed in 1998 and, therefore, everything thereafter is not a bona fide use. What other questions? Well, it seems to me that the intent, the reason that intent is relevant is because it's in the statute, correct? But the intent in the statute is intent not to resume. It's not the first part of the statute. Correct. And that's not a test of whether you're in business or not. It's an intent of what are you doing with your trademark. So you could, for example, in Judge Thomas's hypothetical, you could come to the end of your inventory and you could hope somebody will buy your business and maybe after six months they will. And I assume that in that case you would argue the mark had not been abandoned, correct? If there isn't a complete cessation of use of the mark for a sufficient period of time, then the issue of abandonment shouldn't come up. It's only if there's a long period of complete non-use. So if there were a three-year gap, for example, between selling out your product and then let's make it three-and-a-half years just to make it a little easier. If there were a three-and-a-half-year gap, then there would be at least a prima facie case of abandonment, correct? Correct. Okay. Your time is up. One last question. Go ahead. Thank you. Last question. Here's one more question. What about the case about the rugger shirts? I mean, that seems like the closest in case. It was a district court case. And I guess my question is, was that wrongly decided? If not, how is it different? I don't think they were using the mark on shirts and they were selling the shirts. And nonetheless, the district court said, but they weren't really exploiting the mark when they were selling the shirts. I don't think that it was wrongly decided. I think it was correctly decided. But the use was completely antithetical to a trademark use. What happened was the company had 100,000 labels left from an abandoned line of apparel items. And they didn't know what to do with them. So they put the labels on promotional items, on T-shirts, on things that had nothing to do with the source. They weren't promoting the line in any way. They were just using up the labels. And the court determined that that use of a mark was not bona fide because they weren't promoting the goods that they were selling and associating them with the source. They were just getting the whole purpose was just to get rid of this 100,000 labels that they had nothing to do with. So I don't believe that that case is analogous to this case. But I believe the case was correctly decided. Thank you, counsel. Thank you. Good afternoon. I'd like to address the last issue that was raised regarding the labels on the T-shirts or on the shirts and the fact that the labels were promoted. I think that that's exactly analogous to this case because I think that there was a discontinuous or discontinuance of use effective as of the date that Mr. Mallett basically stopped conducting his business. And he did stop conducting his business. The reason it's the same is because the evidence — How can you say — let's stop that, sir. Would you stop right there? Because that really is the part of the crux. How can you say he stopped conducting his business when he was selling the trademarked goods? Well, because the trademark selling goods is not the touchstone of the conducting of the business here. Again, I think that — What do you have to do? Well, I think you have to sell goods with a trademark and use that mark, as even the appellant has indicated, as source identifying. It has to be a use that is source identifying. I think — Okay, let me give you an example, then, because this is where I have a problem with your brief, just so you can explain to me your situation. Let's say Coke decides that Coke Zero is not working anymore, so it's going to liquidate its inventory of Coke Zero. And that's the mark, Coke Zero, not Coke. Is it your position that because they would be liquidating their inventory, that that would not be a bona fide trademark use, and that they would be abandoning it once they made an announcement that they're going to liquidate Coke Zero? No, I don't think that they would be abandoning it, because they would still be operating and presenting themselves and presenting the product as originating from Coca-Cola. What happened in 1998 was — All right, so let's change the hypothetical a little and say that Coke instead announces that they're going out of business in a year. But in the meanwhile, they're going to sell Coke Zero with the trademark Coke Zero, and they're going to reap the benefits of the fact that people like Coke Zero. So why is that an abandonment? Until — at the beginning, it's certainly an abandonment at the end, but why is it an abandonment at the beginning? Well, I wouldn't think that it would be an abandonment at the beginning, because if the business — Why is it always not here? If the business was continuing — because the business wasn't continuing.  And he actually approached Pelican Products in 1998 and tried to get rid of all of this inventory, not for the purpose of selling his goods under a trademark, but for the purpose of allowing Pelican to promote its own goods. But isn't that at least a disputed issue of fact? I mean, he was, in fact, selling goods with the Pelican label on it, and you choose to characterize that as going out of business, or not being in business at the time, but he was conducting business. He was selling it and getting an exchange for it. How can you take the position that he wasn't in business? Well, it's no different than someone that goes out and tries to sell an Edsel that he has, and merely because he has a product and it has a trademark on it, is not sufficient to constitute trademark use, any more than someone who was trying to sell an Edsel would engender some sort of goodwill by virtue of the fact that Edsel was on it, the Edsel name was on it. The fact is that Mr. Mallett, after 1998, never promoted the goods as trademarked goods. They were just generic goods that he was trying to get rid of. When you say that, that seems to me to be at a minimum a factual issue. The difficulty is it seems to me that we're mixing and matching business questions with statutory trademark questions. The statute basically says it's abandoned if use has been discontinued with intent not to resume, and they're talking there about trademark use. So I'm having some trouble understanding why someone who is the trademark holder selling trademarked goods is not selling goods that meet a trademark use under the statute. That's where I get stopped when I try to look at the statute. I think you have to look at the nature of the activity that he was engaged in, and frankly there's no dispute about this. If you look at the receipts, the receipts were for generic goods. They were not for Pelican branded goods. When you look at the transactions, they were made, five of those 13 last transactions were made to a consignment outfit, not he wasn't trying to sell product based upon the trademark. Furthermore... Well, Saks Fifth Avenue, you know, all these big retailers, a lot of them consign goods. That certainly can't be a benchmark of whether something is trademark use. No, but... So what is it about his use that makes him different from anyone else who is in a failing business but still selling trademarked goods? Because the actions that Mr. Mallett took were as much as an announcement that he was going out of business, that he was no longer conducting business. When he discontinued all advertising, when he dismissed his sales representatives, when he discontinued using any receipts, letterheads, or anything of that sort that mentioned Pelican, he simply stopped using Pelican in connection with those sales. In fact, what he said was, in his deposition, his only intent, and he said this several times, he admitted it, his only intent was just to get rid of inventory, that's all. And I think the fact that he didn't associate the mark with the sales transactions after 1998, combined with his admission that he had no intent of ever ordering again, and he had no intent of doing anything other than getting rid of inventory, demonstrates... Well, on that point, I guess I would wonder, if you look at the history of trademark law and the purpose of a trademark, which is source identification, which I think both counsel have alluded to, that really relates to the consumer. And up to now, we've talked only about what Mr. Mallett did with his business. Was there anything in terms of consumer purchase of these that somehow disassociated the products from the mark in any way? Well, I think that there was. If you look at those 13 transactions and you look at who those transactions were with, you will find that 12 of those 13 transactions were made with entities that were not customers of the Pelican business while it was being conducted. And so, you know, those entities would have had no connection at all between Mr. Mallett and the Pelican mark. It was totally incidental that the products incidentally had leftover tags from 1996 when those goods were ordered. I guess that you're kind of compounding my problem by your answer, and the reason is you're still ignoring the consumer because that's a middleman. The consumer is somebody who buys the backpack and says, I hate those backpacks. Those Pelican backpacks never last. Or I like Pelican backpacks. I'm glad I found one because I haven't seen very many out here. So was there anything in terms of the trademark use that was undermined by his sales in terms of the consumer? Yes, I think there was. Let's look at it from this standpoint. A consumer who purchased a product before 1998 would have looked to the entity, the fictitious name Pelican, as being the entity that was actually generating the goodwill, the entity to whom Mr. Mallett, to whom the consumer would look for replacing that product. After 1998, the consumer would see Pelican. They would look for the same entity, and yet that entity no longer was being promoted or existed insofar as Mr. Mallett was concerned. Those products were being made under names like Mallett Associates or Ron Mallett. They were not being made or associated with an entity to which the goodwill had previously attached before 1998. Okay, well, that's a whole other question. You're suggesting now that somehow the entity metamorphed in some way that removed it from the trademark. And that almost sounds like an argument that he's not the trademark owner. So maybe if you could clarify that. Well, and the difficulty here is, and I'll concede it, is that Pelican was a DBA that was a business name owned by Mr. Mallett and his wife. They conducted that as a separate independent business under the name of Mallett. But the fact is, legally, Mr. Mallett and Pelican were the same entity. We haven't focused on that point because of that fact. But when you ask the question, what did the consumer see, what did the consumer look at, the consumer doesn't know that Pelican is a DBA. The consumer sees Pelican as a separate business. They have no way of making a connection between Mr. Mallett as an individual. And the previously projected business of Pelican that appeared on all of the letterheads, the advertisements, and so forth. But all this requires. But they're getting the product that they think they're getting with the name Pelican on it. They're getting it from the person who they thought they were getting it from. So what is their problem? Well, I don't think they were getting it from the person they thought they were getting it from. And they had no way to know. And Mr. Mallett never projected, after 1998, a connection between himself and the ownership of that mark. Well, he says in his affidavit that he sold, continued to sell Pelican-branded marks. He says that he enjoyed the same reputation that he did before 1998 among consumers, I assume he's talking about. He says he made the best backs in the business, and his reputation remained after that. Now, he says that. But here we are on summary judgment, and we have to draw all the inferences in his favor. Much of your argument, it seems to me, is based on inferential reasoning, isn't it? Well, it does. But the facts of what we're talking about on summary judgment is whether there's a disputed material fact. And the facts, I think, are undisputed. If you look at Judge Minella's decision and you evaluate those facts, those facts are undisputed. And I think it's legitimate on summary judgment for a court to make inferences from undisputed facts, inferences that are supported by the law. I don't think that's precluded by at the summary judgment level. But you do have to draw inferences if their inferences are redrawn in favor of a nonmoving party, if they're critical inferences. And it seems to me that many of these are fairly important inferences that you're drawing. Well, I think that you're right. But if Mr. Mallett decided to stop using Pelican as a business and conducting a business, actually went out and sought other employment, actually bought into another business as an owner and signed a noncompete clause in that business, the only inference that can be made is that he was discontinuing his business of Pelican, and that any activity that he was engaged in after that was not in furtherance of that business. I think that's the only inference you can make from those facts. Well, his testimony, I recall, was something to the effect of he didn't see this as competing, and he didn't think it came within the noncompete. So I don't know how we can resolve that on appeal in a summary judgment situation. Well, except his opinion is not evidence that I think can be a basis of overturning the district court. I think his opinions and, frankly, his statement made long after the fact are entitled to little, if any, weight. They're very self-serving, and they're not supported by any evidence at all. And so I don't think that they can be taken into consideration in terms of the Court's decision on summary judgment. So what do we look at? We just look at the inventory? And if that's the case, going back to Judge McKeown's example about Coke Zero, how is that any different? Well, except under Coke Zero, Coke was continuing to present itself as Coca-Cola as the business. Mr. Mallett ceased doing that in 1998, and he went to representing himself, a different entity, to the public. The public saw Mallett and associates selling some branded good, just like he was selling other branded good. They had no way of determining that he was the source or that the source was any different than the source that existed before. He sourced that Mallett himself, Mr. Mallett himself, said that he was discontinuing. That argument doesn't make any sense to me because, you know, let's take the case of Coke. What the consumer wants to know is that whatever is in that can is coming out of that secret vault in Atlanta, in terms of the Coke now modified Coke Zero formula. The consumer is, and it wants to know if it has a problem and the can blows up, where to go to. Just like if you were a consumer of a backpack and there was some problem with flammability, you would want to know where to go to. Well, wouldn't you go to the person who imported and is selling Pelican backpacks, who happens to be Mr. Mallett, whether he's DBA Pelican or DBA Mallett? I'm really having trouble understanding the legal significance of your statement. Let me make a. Maybe I'm just being dense on it. I keep hearing this argument, but I'm wanting to fit it in the statute. So maybe you can help me on that. OK, I think, again, the statute requires that it be that it be bona fide use of the mark in the ordinary course of trade. And the issue still comes down to what is bona fide use and bona fide use. I think even a pellet agrees is source identifying use. And when Mr. Mallett sells leftover inventory that he's just trying to get rid of, that is not a source identifying use of a mark anymore than if take the Coca-Cola situation. Coca-Cola decides to sell off all of its inventory to a liquidator. And the liquidator holds on to that product for two years and then sells that product. And Coke has gone out of the business. Suppose he doesn't hold on to it for two years, but he sells it immediately or continuously. But it isn't Coke who's selling it. Yet people who are buying it are buying Coke. And so isn't he still exploiting the mark? Well, perhaps it's I guess too much to look at a well-known name like Coke because there is significant residual goodwill that exists with that. We're talking about a small business as to which residual goodwill of the nature of Coca-Cola simply did not exist. And there's no evidence of that. He claims otherwise. He claims that he had a good reputation. They claim otherwise, yeah. Well, let's take Martha Stewart. Let's say she says, I'm going to jail, I'm shutting this down. So Kmart says, you know what, we're going to liquidate all of Martha Stewart's sheets and everything else because there's no doubt she's going to go to jail, she's not going to continue her business. Under your theory, it would seem to me that it would be open season for anybody to then come in and use the Martha Stewart trademark on sheets or whatever because essentially she said I'm not going to continue my business and Kmart, you know, is going to take six months to sell out the inventory. Why wouldn't that be the same thing? Well, it wouldn't be the same thing because Martha Stewart has residual goodwill that has been developed over a significant period of time. There is no such residual goodwill in this case. This was a very, very – Let me stop there because I think – I'm just trying to narrow the issues. So let's take away what we'll call the famous mark and instead we have just an average trademark that doesn't have the kind of notoriety or what's known as a famous mark. Just so I understand your point, you're saying that because the goodwill was de minimis, that once he starts the liquidation that it then becomes so attenuated that it's really not a trademark use? Is that accurate? I think that that – I guess I haven't thought of it in that respect, but I think that that's probably accurate. And let me just point out again that of the purchasers of these goods after 1998, only, well, 11 of the 13 purchasers of those goods were brand-new customers that had never purchased from Mr. Mallet before. And I think that's significant because you talk about the goodwill that exists. If these customers are, in fact, distributors and they distribute to little mom-and-pop stores someplace, how in the world is there any residual goodwill that exists at all by those kinds of transactions? How do we know that on this record? The customers? We know the customers, but how do we make the inferential leap that there's no goodwill at all left in this product? Well, I think that we have shown facts that show that he discontinued and didn't intend to continue using the mark, and whatever sales he had were simply incidental sales that he could have taken the mark off. He would have been just as happy. They were not bona fide sales where he was trying to acquire goodwill in the mark to himself. And the fact that he sold to people under his own name without even mentioning Pelican and sold those goods, I think is indicative of the fact that they were not bona fide sales of the mark in commerce. Your time has expired, but I want to make sure everybody's asked all the questions they want to ask. Judge McHugh, Judge Berzon, do you have anything more to ask? No, I don't. Thank you. Okay. Thank you, counsel. Thank you very much. We'll give you two minutes for rebuttal. Thank you. I don't think I'm going to need the two minutes. Just two quick comments. First off, of the 12 of the 13 sales, they all went to surf shops, similar types of customers that bought the backpacks in the past. And the fact that there were new customers is actually helpful, not harmful. And that's the issue before you. We're drawing inferences from the evidence that a district court can't draw. There are positive inferences to draw and negative inferences to draw. And on summary judgment, you've got to decide the facts in the favor of the non-moving party. The final thing I'd like to say is this. What kind of burden, if the district court's decision is upheld, what kind of burden are we going to be placing on small businesses in this country in terms of trademark use? Are we going to create a whole new analysis for small businesses versus famous businesses, versus businesses with better-known marks versus lesser-known marks? Did Congress so authorize such an analysis? I don't think so. And what we're going to do is open up a Pandora's box for every large company to come in and take a look at a small company's use of a mark and say, we like that mark. Let's take a look and investigate and see how much use this mark has been put to. And maybe we can kind of grab this mark from the small company because we can show, on summary judgment, that their use just isn't a bona fide use, not because they had any real intent to abandon the mark, but because they're just plodding along and they're not doing a very good job of it. And I don't think that's what Congress intended. That's not what the law is about. And the district court's decision shouldn't be upheld for that reason because it's going to create a lot of problems. Thank you very much for giving us the time. Roberts. Thank you, counsel. I want to thank all of you for coming here today. I know we've had a few logistical problems, and I appreciate your patience and courtesy with the court. I think oral argument was very valuable, and occasionally these logistical problems arise. So I appreciate you coming here today. I appreciate your briefing. The matter will be submitted.
judges: Thomas, McKeown, Berzon